[No. S004710. Crim. No. 25416. May 23, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
HENRY EARL DUNCAN, Defendant and Appellant.

**COUNSEL**

Mitchell Zimmerman, under appointment by the Supreme Court, Sally M. Abel, Wayne D. Skigen, Stacie L. Solari, Fenwick & West, and Fenwick, Davis & West for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attoreney General, Arnold O. Overoye, Assistant Attorney General, Raymond L. Brosterhous III, Ward A. Campbell and Lisbeth Bellet, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**PANELLI, J.**—Defendant Henry Earl Duncan was convicted of the first degree murder of Josephine Eileen DeBaun (Pen. Code, § 187),[1] robbery (§ 211), and grand theft (§ 487). The jury found true a special circumstance allegation that the murder was committed in the course of a robbery (§ 190.2, subd. (a)(17)(i)) and that defendant "intended to and did kill" the victim. The jury also found that defendant personally used a knife in the commission of the murder and robbery (§ 12022, subd. (b)). The jury fixed the penalty at death; this appeal is automatic. (Cal. Const., art VI, § 11; § 1239, subd. (b).)

### Guilt Phase Facts

*Prosecution Case*

The victim, Josephine Eileen DeBaun, was the night supervisor at the International Host Restaurant in the Pan Am Terminal at Los Angeles International Airport. As the night supervisor, Mrs. DeBaun collected, counted, and deposited the money from the cash registers into a Brink's safe located in a small caged area within the office, known as the money room.

Defendant worked as a night cashier at the restaurant and was on duty on November 13, 1984, the night DeBaun was killed. The time clock records show that defendant punched out that night sometime between 11:01 and 11:06. The other remaining employees, Rafael Felix, Francisco Castro and Daryl Jackson, punched out between 11:30 and 11:42 p.m.

Defendant was seen by custodian Bernice McCarty lingering on the mezzanine level at 11:30 p.m. McCarty had never before seen defendant hang around after hours. Defendant told her he was waiting for someone.

DeBaun was last seen alive by Harvey Morgan of Ace Pest Control, who had arrived at 10:50 that night, after closing, to spray. DeBaun remained there alone after Morgan left about 11:50 p.m. DeBaun telephonically recorded some sales figures about midnight.

DeBaun's body was found early the next morning by the morning shift restaurant supervisor. The body was lying in a pool of blood in the money room. The grate was down on the public door, and the office door was locked. The cage door to the money room was partially open. The supervisor's "floating fund bank" was open, with the "boss key ring" dangling

---

[1] Unless otherwise indicated, all statutory references hereafter are to the Penal Code.

from the lock. About $2,100 was missing from the bank. The money room also held the Brink's bank in which the proceeds of each shift were deposited and the "nest banks" for each cashier in which $300 was kept. The Brink's bank required two keys to open it: one possessed by the supervisor and one by a Brink's agent.

Each supervisor had a personal key ring which held a key that unlocked the restaurant, the office door, the caged money room within the office, and the locked key panel in the money room. DeBaun's personal key ring was never recovered.

The restaurant employees were aware that only the "V.M.-19" key on the boss key ring could open the floating fund bank. At the end of each shift, the boss key ring was locked inside a wall box that contained a panel for keys. Although it was not generally known, a duplicate key with the serial numbers V.M.-19 facing inward (not readily visible) was kept inside the same key panel. After the murder no one thought to check and confirm whether this duplicate V.M.-19 key was still in the panel. Although other locks were recored after the murder, the lock to the floating fund bank was not changed because the original V.M.-19 key was found in the lock.

At the murder scene there was blood splattered on the walls and nest banks. Bloody palm prints were found on a metal cabinet to the right of the body. A bloody shoe print was inside the money room, facing outward. Three bloody palm prints and one bloody fingerprint were photographed at the scene.

Defendant returned to work on November 15, his next regularly scheduled work day, and continued working at the restaurant until February 8, 1985.

On February 8, 1985, defendant used a key marked V.M.-19 and stole $1,770 from the supervisor's floating fund bank and $300 from his own nest bank. The V.M.-19 key was found in defendant's car. Defendant never returned to work after this theft. At the beginning of trial on the murder and robbery charges, defendant pleaded guilty to one count of grand theft arising from this incident.

Defendant's palm prints were taken at the time of his arrest for the February 8 theft. They were identified as matching the bloody palm prints from the murder scene. In addition, defendant's Nike shoes had a sole pattern similar to the bloody shoe print found at the murder scene.

There were many cutting and stabbing wounds on the victim's body. Her head was nearly severed and there were a number of defensive wounds on

her hands, palms, fingers and forearm. A broken knife handle was found on the floor, and there was a bloodstain on a record book that corresponded to the blade of a knife.

On November 14, 1984, the day DeBaun's body was found, one of the cooks noticed that a butcher knife and a broad-bladed meat slicing knife were missing from the kitchen.

*Defense Case*

The defense was two pronged. First, the defense contended there was a reasonable doubt as to whether defendant committed the crime and suggested there were other persons who could have been the killer. Defendant did not testify, and no expert witness testimony was presented. Several witnesses identified other employees and former employees who might have had a motive or who were around the restaurant the evening of the killing.

Second, the defense asserted a theory that the murder had been committed by outsiders to the restaurant. The support for this theory came from testimony elicited on cross-examination of the coroner that some of the victim's wounds could have been inflicted in an attempt to torture her. In closing argument, defense counsel asserted that the perpetrator had tortured Mrs. DeBaun to force her to open the Brink's safe, an effort which any employee would have known was futile because the Brink's guard's key was necessary to open the safe.

## PENALTY PHASE FACTS

*Prosecution Case*

The People presented no testimony in the penalty phase. The only evidence they introduced was defendant's 1984 federal conviction for conspiracy to pass counterfeit money.

*Defense Case*

Defendant's mother, older brother, and two sisters testified that defendant had been an obedient and nonviolent child who had never been in trouble at school. He graduated from high school and attended junior college. Defendant's behavior began to change in 1984 when he began using cocaine. Defendant stole money from his family and pawned things; he was obsessed with money.

Defendant's mother collapsed on the stand during her testimony and was removed for medical treatment.

### GUILT PHASE CONTENTIONS

### 1. *Ineffectiveness of Counsel*

Defendant contends that he received ineffective assistance from counsel in two respects. First, he contends counsel failed to engage in meaningful preparation for trial. Second, he contends that counsel misunderstood the law of felony murder.

■ To establish entitlement to relief for ineffectiveness of counsel defendant must show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Lewis* (1990) 50 Cal.3d 262, 288 [266 Cal.Rptr. 834, 693-699, 786 P.2d 892]; see also *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 104 S.Ct. 2052].)

■ Under *Strickland* v. *Washington*, our review of counsel's performance is to be highly deferential. As the court there noted: "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.] There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983)." (*Strickland* v. *Washington, supra*, 466 U.S. at pp. 689-690 [80 L.Ed.2d at pp. 694-695].)

■ Based on counsel's fee request, defendant calculates that counsel spent no more than 35.1 hours on preparation for trial. What defendant

overlooks, however, is that counsel represented him through the preliminary hearing as retained counsel. The time counsel devoted to preparation for and representation at the preliminary hearing is not reflected in the fee request. Thus the time records do not fairly represent the involvement of counsel prior to his appointment by the court.

Defendant is essentially asking us to presume ineffectiveness based on an incomplete view of counsel's involvement with defendant and limited only to his time records. We are unwilling to do that. We would still be unwilling to do so even if the records were totally reflective of the time counsel spent in trial preparation, for a presumption of ineffectiveness based on time records alone would fly in the face of all directives that defendant must show ineffectiveness to a demonstrable reality. (See *People* v. *Pope* (1979) 23 Cal.3d 412, 426, fn. 16 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

■ Defendant also contends that the record shows counsel was laboring under a misunderstanding of the law of felony murder.

Defendant relies on statements made by his counsel during discussion of jury instructions. During initial discussions counsel misspoke in referring to the vicarious-murder rule (e.g., bystander killed by police during robbery) as felony murder.[2] The balance of the discussion, however, reveals no misunderstanding of the law of felony murder. Defense counsel agreed with the court and the prosecutor that it would be felony murder if any robber killed during the course of the robbery. A lengthy discussion then ensued regarding whether to give malice instructions or an instruction limited only to felony murder. During the course of the discussion both counsel agreed that since the case was limited to robbery and murder, only first degree felony-murder instructions should be given and that no second degree murder or manslaughter instructions should be given. Counsel also agreed that an intent-to-kill instruction was required for the felony-murder special circumstance under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], even if defendant was the actual killer.

Defendant further relies, as an example of incompetence, on a statement by trial counsel early in the discussion where counsel asserted that the same felony could not be used for both felony murder and a felony-murder special circumstance. This may have been in reference to the vicarious liability rule which counsel hoped to invoke, since the assertion was made before counsel's terminology was corrected.

---

[2] The subject was brought up in connection with counsel's assertion that the evidence supported a theory that two persons were involved and that defendant may not have been the killer.

In our view, the record does not establish whether counsel was operating under a misunderstanding of the law. It is clear that counsel mistakenly referred to the vicarious liability rule as the felony-murder rule, but it is not clear what applicability counsel had in mind for the vicarious-murder rule. That rule is invoked when the killer was not one of the persons who committed the felony. Defense counsel apparently hoped to fashion some argument for its applicability in connection with his advancement of the theory that someone other than defendant was the actual killer.[3] In any event, counsel immediately recited the felony-murder rule correctly once the mistake in terminology was discovered.

Counsel's confusion may have related only to the vicarious liability rule, which had no applicability under the facts presented. Even if counsel's confusion had extended to the felony-murder rule, defendant still fails to show how any such confusion affected the trial of the case. The evidence clearly placed defendant at the murder scene, and he was found in possession of the supervisor's floating fund key. On this record defendant has not shown any reasonable probability that a more favorable result might have been reached had counsel shown no confusion about the felony-murder rule. Thus there would be no grounds for reversal even if counsel had been confused about the law of felony murder.

■ Defendant also complains about counsel's suggestion in closing argument that another reasonable explanation of the evidence was that the crime was committed by two outsiders who may have tortured the victim to get her to open the safe. Counsel made the argument to direct suspicion away from defendant since he and all of the other restaurant employees knew that the safe could not be opened without the Brink's key and therefore would not have tried to force the victim to open the safe. Defendant contends that counsel's argument had a prejudicial impact in the penalty phase. We disagree. The comment consumed one page of the fifty-page transcript of counsel's argument. In light of the gruesome nature of the victim's injuries and in evaluating the claim of ineffective assistance of counsel, we see no reasonable probability that the jury would have reached a different penalty verdict had counsel not made this argument. (*People* v. *Lewis, supra,* 50 Cal.3d at p. 288; *Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-696 [80 L.Ed.2d at pp. 693-699].)

### 2. *Failure to Instruct on Lesser Included Offenses*

■ As previously stated, the trial court instructed only on two crimes, robbery and first degree felony murder. Defendant contends it erred in

---

[3] Counsel did, in fact, succeed in obtaining aider and abettor instructions based on his theory that someone other than defendant was the killer.

failing to instruct sua sponte on the lesser included offenses of grand theft and second degree murder, and on first degree malice aforethought-murder, because there was evidence supportive of the theory that the murder preceded the formation of the intent to steal. The manner of the victim's killing, according to defendant, is indicative of an "explosion of violence," suggesting that robbery was not the purpose of the killing.

■ " 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.] That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 715 [112 Cal.Rptr. 1, 518 P.2d 913].)

■ The obligation to instruct on lesser included offenses exists even when a defendant, as a matter of trial tactics, objects to their being given. But the doctrine of invited error will operate to preclude a defendant from gaining reversal on appeal because of such an error made by the trial court at the defendant's behest. (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 716; *People* v. *Wickersham* (1982) 32 Cal.3d 307, 330 [185 Cal.Rptr. 436, 650 P.2d 311]; *People* v. *Cooper, ante,* 771, at p. 827 [281 Cal.Rptr. 90, 809 P.2d 865].) "For the doctrine to apply, 'it must be clear from the record that defense counsel made an express objection to the relevant instructions. In addition, because important rights of the accused are at stake, it must also be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' " (*People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1234 [249 Cal.Rptr. 71, 756 P.2d 795].)

■ The doctrine of invited error applies in this case to the failure to give any other homicide instructions. The record shows that counsel requested the court to give only the felony-murder instruction as a matter of trial tactics because then the prosecution would have to prove robbery and intent to kill. Counsel stated he had considered the matter, discussed it with his client, and that "in weighing all of the factors, I am of the opinion, and Mr. Duncan concurs, that this particular case is a situation wherein we would not request any lesser included offenses." The court made several inquiries of defendant regarding his understanding and agreement with the tactic, and specifically warned defendant that he would not be able to use this as a ground of appeal. The record clearly reflects that the failure to

instruct on lesser included homicide offenses, as well as first degree malice-aforethought murder, "resulted from a deliberate choice by defense counsel as well as defendant personally to utilize an all-or-nothing tactical strategy." (*People* v. *Bunyard, supra,* 45 Cal.3d at p. 1235.)

■ Defendant contends that the invited error doctrine is inapplicable because counsel's decision to forgo the giving of other homicide instructions was based on a misunderstanding of the law. His contention is unavailing. We recently held in *People* v. *Cooper, supra, ante,* at pages 830-832 that the invited error doctrine applies so long as counsel made a conscious, tactical choice even if such choice was based on a misunderstanding of the law. The legal theory for complaining about counsel's misunderstanding of the law is ineffectiveness of counsel, not invited error. To hold otherwise puts a trial court in the position of being a guarantor of counsel's tactics: if the tactical decision to request omission of lesser included offenses turns out to have been unknowledgeable, the error should be charged to counsel, not the trial court. Here, however, the record discloses that counsel's choice was a matter of trial tactics. Hence on the face of the record we cannot find incompetence of counsel.

■ Defendant further contends that the offense of grand theft was not mentioned in the waiver of lesser included instructions. He is correct. We therefore turn to the question of whether the court had a duty to instruct sua sponte on grand theft.

■ "The court has a duty to instruct sua sponte on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present, but has no such duty when there is no evidence that the offense was less than that charged." (*People* v. *Lewis, supra,* 50 Cal.3d at p. 276.) ■ In the present case, there was no evidence that the offense, if committed by defendant, was other than robbery. The evidence showed defendant had completed his shift but remained at the restaurant for about an hour in an area that provided a view of the restaurant. The victim was killed in the money room; money was stolen from the safe which could be opened only by a key in the victim's possession. There is only bare speculation to support the theory now advanced by defendant that the intent to steal did not arise until after the victim's death. All the evidence points to robbery as the motive for the killing. Defendant's assertion of an explosion-of-violence theory based on the manner of killing is completely contrary to the evidence presented. A brutal manner of killing does not in itself ordinarily establish a sudden explosion of violence rather than a calculated killing. (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 350 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126].) Thus the manner of killing

alone is not sufficient to support an inference of an after-acquired intent to steal.

The facts of this case are unlike those in *People* v. *Turner* (1990) 50 Cal.3d 668 [268 Cal.Rptr. 706, 789 P.2d 887], and *People* v. *Ramkeesoon* (1985) 39 Cal.3d 346 [216 Cal.Rptr. 455, 702 P.2d 613], where a grand theft instruction was warranted by evidence in the form of the defendant's own testimony that he did not think of taking any of the victim's property until after the victim was dead. That testimony constituted substantial evidence of an after-formed intent to steal. The facts here are more closely analogous to those in *People* v. *Lewis, supra*, 50 Cal.3d at pages 276-277, where we rejected the defendant's claim of error in failing to instruct sua sponte on grand theft as a lesser included offense of robbery. Here, as in *Lewis*, "[t]here was nothing more than sheer speculation to support the scenario now advanced by defendant that the idea of taking the victim's property did not arise until after the victim was dead." (*Id*. at p. 277.) Accordingly, the court did not err in failing to instruct the jury sua sponte on the offense of grand theft.

### 3. *Instructional Errors*

*CALJIC No. 1.00*

██ Defendant contends the court prejudicially erred in failing to give the antisympathy portion of CALJIC No. 1.00 (1979 rev.). The court's failure to give that portion may have been inadvertent since the omitted portion was on the second page of the instruction and there was no discussion of an intent to omit that portion of CALJIC No. 1.00. The court instructed on CALJIC No. 1.00 as follows: "Ladies and gentlemen of the jury, now that you've heard the evidence, we come to that part of the trial where you are instructed on the applicable law. [¶] I'm required to read the instructions to you in open court. In addition you will have these instructions in their written form in the jury room for use during your deliberations. [¶] Whether a defendant is to be found guilty or not guilty depends upon both the facts and the law. As jurors, you have two duties to perform. One duty is to determine the facts of the case from the evidence received in the trial and not from any other source. The word 'fact' means something that is proved directly or circumstantially by the evidence or by agreement of counsel. Your other duty is to apply the rules of law that I state to you to the facts as you determine them and in this way to arrive at your verdict. [¶] It is my duty in these instructions to explain to you the rules of law that apply to this case. You must accept and follow the rules of law as I state them to you."

The omitted portion of CALJIC No. 1.00 reads as follows: "As jurors you must not be influenced by pity for a defendant or by prejudice against him. You must not be biased against the defendant because he has been arrested for this offense, or because he has been charged with a crime, or because he has been brought to trial. None of these circumstances is evidence of his guilt and you must not infer or assume from any or all of them that he is more likely to be guilty than innocent. [¶] You must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. Both the People and the defendant have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict regardless of what the consequences of such verdict may be."

Any error here in failing to give the antisympathy portion of the instruction involves only state law and thus is subject to the *Watson* test of prejudice. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Under that test we have no difficulty concluding that it is not reasonably probable that a result more favorable to defendant would have been reached in the absence of the error. The antisympathy portion of the instruction is simply an amplification of the initial direction to determine the facts of the case from the evidence received at trial and not from any other source, and to apply the rules of law stated by the court to the facts as so determined. Thus, we do not feel that the omitted portion of the instruction hampered the jury in performing its proper function.

*Homicide Instructions*

 Defendant contends the court's instructions on homicide were confusing and contradictory. Since the court and counsel agreed that the case involved only felony murder, the court tailored the instructions to that theory. Defendant contends that the court nevertheless confused matters by mentioning other forms of homicide in the instructions defining homicide and murder.

The instruction defining homicide, CALJIC No. 8.00, stated: "The word homicide means the killing of one human being by another, either lawfully or unlawfully. As used in these instructions the word homicide includes murder and manslaughter, which are unlawful, and the acts of excusable and justifiable homicide, which are lawful." Defendant also complains about CALJIC No. 8.10 (1983 rev.), on murder, which was modified and given as follows: "Defendant is charged in count one of the information with the commission of the crime of murder, a violation of Section 187 of the Penal Code. [¶] The crime of murder is the unlawful killing of a human being with malice aforethought or the unlawful killing of a human being

which occurs during the commission or attempt to commit a felony inherently dangerous to human life. [¶] In order to prove the commission of the crime of murder, each of the following elements must be proved: [¶] 1. That a human being was killed. [¶] 2. That the killing was unlawful, and [¶] 3. That the killing occurred during the commission or attempt to commit a felony inherently dangerous to human life. Robbery is a felony inherently dangerous to human life. [¶] Malice aforethought is not required under the law of this case."

The court then instructed on first degree felony murder during the commission of robbery (CALJIC No. 8.21, mod.) and that if the jury finds defendant guilty of murder, it is first degree murder as a matter of law (CALJIC No. 8.70, mod.). We believe these instructions, taken as a whole, clearly conveyed to the jury that first degree felony murder was the only type of homicide at issue in the case. We find no reasonable probability that the jury would have been misled by these instructions. (*People* v. *Watson*, *supra*, 46 Cal.2d at p. 836.)

*Intent to Kill*

■ Defendant contends that the court gave an ambiguous instruction on the intent to kill requirement for the special circumstance allegation. At the time of the murder and the time of the trial, intent to kill was a required element of the felony-murder special circumstance for an actual perpetrator as well as for an aider and abettor. (*Carlos* v. *Superior Court*, *supra*, 35 Cal.3d 131, overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306].)[4] Defendant contends that the court's instruction reasonably could have been interpreted to mean that intent to kill was required only if defendant was an aider and abettor but not if he was the actual killer. We do not agree.

The court gave a modified version of CALJIC No. 8.80 (1984 rev.) as follows: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if murder was committed under the following special circumstance: [¶] That the murder was committed by defendant Henry Earl Duncan while he was engaged in the commission of robbery in violation of section 211 of the Penal Code. [¶] A special circumstance must be proved beyond a reasonable doubt. If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true. [¶] If defendant Henry Earl Duncan was an aider and abettor, but

---

[4]Our holding in *People* v. *Anderson*, *supra*, 43 Cal.3d 1104, may not be applied here since the crime was committed during the time that intent to kill was required under *Carlos* v. *Superior Court*, *supra*, 35 Cal.3d 131. (*In re Baert* (1988) 205 Cal.App.3d 514 [252 Cal.Rptr. 418].)

not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant Henry Earl Duncan. [¶] In order to find the special circumstance charged in this case to be true or untrue, you must agree unanimously. [¶] You will include in your verdict on a form that will be supplied your finding as to whether the special circumstance is true or not true."

The above instruction was followed immediately by a modified version of CALJIC No. 8.81.17 (1984 rev.): "To find that the special circumstance referred to in these instructions as murder in the commission of robbery is true, it must be proved, one, that the murder was committed while the defendant was engaged in the commission of a robbery; [¶] Two, that the defendant intended to kill a human being or intended to aid another in the killing of a human being; [¶] Three, that the murder was committed in order to carry out or advance the commission of the crime or robbery or to facilitate the escape therefrom, or to avoid detection. In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder."

Although CALJIC No. 8.80, standing alone, might have been subject to misinterpretation, any confusion was clarified by the statement immediately following in CALJIC No. 8.81.17 that the jury must find "defendant intended to kill a human being or intended to aid another in the killing of a human being." Further clarification was contained in the special circumstance verdict form itself, which stated, inter alia: "We further find to be [insert TRUE or NOT TRUE] that defendant HENRY EARL DUNCAN intended to kill and did kill Josephine E. DeBaun." The jury's finding on the verdict form found it true. Thus, it was abundantly clear that defendant was found to be the actual killer. We do not see any possibility that the jury reasonably would have believed that intent to kill was necessary only if defendant was an aider and abettor rather than the actual killer.

### 4. Defendant's Absence From Proceedings

Defendant contends that his absence from in-chambers discussion on the morning of the first day of trial violated his statutory and constitutional right to be present during all proceedings. Before proceeding with the discussion the court queried counsel about whether defendant's presence was necessary. Defense counsel said he did not think it was necessary "for these type of preliminary questions." The matters discussed and agreed upon were procedures for streamlining jury selection that were utilized in the Fields case (People v. Fields (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]), whereby the hardship voir dire would be conducted first.

Following the hardship voir dire the court would read the four *Witherspoon* (*Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) questions to the assembled venire members in open court. The clerk would then select 12 venire members by lot, and the remaining venire members would wait in the hall. The court would then ask each of the 12 jurors the 4 *Witherspoon* questions in sequestered voir dire. Unless there were an unusual response it was not anticipated that further questions would be asked. Based on the use of these discussed procedures, counsel estimated that the entire guilt phase would take about 10 days. Defense counsel agreed to start the penalty phase immediately if defendant were found guilty. Concededly, defendant was not present during the foregoing in-chambers discussion.

■■■ As a general rule, "the accused is not entitled to be personally present either in chambers or at bench discussions which occur outside of the jury's presence on questions of law or other matters in which defendant's presence does not bear a 'reasonably substantial relation to the fullness of his opportunity to defend against the charge.' [Citations.] Stated in another way, '[W]hen the presence of the defendant will be useful, or of benefit to him and his counsel, the lack of his presence becomes a denial of due process of law.' [Citations.] The burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial." (*People* v. *Jackson* (1980) 28 Cal.3d 264, 309-310 [168 Cal.Rptr. 603, 618 P.2d 149].)

We have, in a number of cases, found the accused's absence to be nonprejudicial in similar situations. (*People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1021 [248 Cal.Rptr. 568, 755 P.2d 1017]; *People* v. *Douglas* (1990) 50 Cal.3d 468, 517-518 [268 Cal.Rptr. 126, 788 P.2d 640] [absence from re-reading of testimony]; *People* v. *Jackson, supra,* 28 Cal.3d at pp. 309-311 [in-chambers motion for mistrial]; *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1079-1080 [259 Cal.Rptr. 630, 774 P.2d 659] [motion for continuance, in-chambers advisement by court regarding limitation of voir dire, in-chambers conferences regarding scope of cross-examination].)

■■■ We find defendant's absence here likewise to be nonprejudicial. Limitation of the *Witherspoon* voir dire (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510) and the timing of the penalty phase were technical matters about which defendant would have little to contribute. Indeed, defendant fails to proffer any concrete way in which his presence would have aided matters, or any prejudice suffered as a result of his absence. Contrary to defendant's assertion, the situation here is not like that in *Near* v. *Cunningham* (4th Cir. 1963) 313 F.2d 929, where the defendant's absence from an in-chambers decision that the jury would not be sequestered, and the jury's resulting

exposure to prejudicial remarks, were found to constitute a denial of due process. The court there expressly noted that it was not deciding that the defendant's absence "from the conference—nothing else appearing—would of itself result in such an unfair and unjust trial as to violate the provisions of the Fourteenth Amendment. . . ." (*Id.* at p. 932.)

### 5. *Prosecutorial Misconduct*

■ Defendant contends the prosecutor's jungle metaphor during closing argument was a thinly veiled racist allusion that constituted prejudicial misconduct. (Defendant is Black and the victim was White.) Defendant refers to the following argument by the prosecutor: "My last thought, during this entire trial, you have seen the defendant sitting there in a suit, and in the sanitized area of a courtroom, you have jurors, court reporters, people in the audience. You have a bailiff who is armed. Sometimes we lose sight of what it must have been like at a little after midnight on the 13th of November, 1984. [¶] And therefore, I give you this analogy. [¶] You have friends come in from out of town. And so one of the things you do with them, you take them to the San Diego Zoo. [¶] And as you walk along with your friends, these high steel bars and moats, you look back there; there are large striped animals lolling in the sun, looking like kittens. And this little brass plaque up here says, 'Bengal tiger.' [¶] And you tell your friends that that's a Bengal tiger. [¶] Wrong, wrong, wrong. That's a Bengal tiger in captivity, behind bars, and is being fed so much meat every day. [¶] However, if you and your friends were on a houseboat in Pakistan or India, and the boat comes up to the shoreline in the evening; and you get off the boat; you're walking along; and you push a big palm frond aside; and there you see a huge striped animal with blazing eyes, with cubs, that's a Bengal tiger. And that's a Bengal tiger in its natural habitat. [¶] Mr. Cheroske [defense counsel] wants to know why you have to cut up the person that we have once known as Eileen DeBaun. [¶] If you were there that night, you wouldn't see the defendant in his suit, the way you have seen him in this trial. You would see him with a butcher knife, out to get money. You would be seeing him in a very natural habitat. [¶] Consequently, the People submit that the evidence in this case shows overwhelmingly that this defendant is responsible for the murder of Eileen DeBaun."

■ Defendant did not object at trial to this argument and therefore waived the point. Under the rule of *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468], a defendant must object and seek a curative admonition to preserve the point for appeal. If he has not done so, we will consider the point only if the misconduct is such that the harm could not have been cured by a timely admonition. Then and only then will we reach the issue of whether on the whole record, the harm resulted in a

miscarriage of justice within the meaning of article VI, section 13 of the California Constitution. (27 Cal.3d at p. 34.)

 We nevertheless address the claim on the merits to forestall an ineffectiveness of counsel contention based on the failure to object at trial. (See *People* v. *Lewis, supra,* 50 Cal.3d at p. 282.) We find no impropriety in the argument. The prosecutor was attempting to focus the jury's attention on the vicious nature of the crime. He clearly wanted the jury not to be misled by defendant's benign and docile appearance at trial, but to remember him as the murderer. The prosecutor was entitled to point out that modest behavior in the courtroom was not inconsistent with violent conduct under other less structured and controlled circumstances. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 579-580 [244 Cal.Rptr. 121, 749 P.2d 776]; *People* v. *Thornton* (1974) 11 Cal.3d 738, 762-763 [114 Cal.Rptr. 467, 523 P.2d 267].) We find no error in this argument.

Defendant's complaint that the Bengal tiger argument was a thinly veiled racist allusion does not withstand scrutiny. Likening a vicious murderer to a wild animal does not invoke racial overtones. Indeed, the circumstances of the murder might have justified even more opprobrious epithets. (See *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1030 [254 Cal.Rptr. 586, 766 P.2d 1] [snake in the jungle]; *People* v. *Bloom* (1989) 48 Cal.3d 1194 1213 [259 Cal.Rptr. 669, 774 P.2d 698] [evil incarnate like the legendary villain Fu Manchu]; *People* v. *Hovey, supra,* 44 Cal.3d at pp. 579-580 [comparison to Adolph Hitler's genocidal theories].)

### Penalty Phase Contentions

#### 1. *Jury Instruction on Sentencing Discretion*

The court gave the 1986 version of CALJIC No. 8.84.2, which reflects the changes suggested in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]). The instruction read as follows: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on defendant. [¶] After having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you

are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] You shall now retire and select one of your number to act as foreman, who will preside over your deliberations. In order to make a determination as to the penalty, all twelve jurors must agree."

■ Defendant contends that the instruction given (CALJIC No. 8.84.2, 1986 rev.) was invalid because it did not state the following language from section 190.3: "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances, the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole."

His contention fails. In *People* v. *Brown, supra,* 40 Cal.3d 512, we noted that instruction in the terms of the statute had the potential to confuse jurors and thus suggested the adoption of an instruction like the one given here. (*Id.* at p. 545, fn. 19.) The instruction given informed the jurors that to return a verdict of death they must be persuaded that the "aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." We do not think that there is a reasonable likelihood that any of the jurors would have concluded that, even if the mitigating factors outweighed those in aggravation, the "so substantial in comparison with" language nevertheless might demand imposition of the higher punishment. (See *Boyde* v. *California* (1990) 494 U.S. 370, ___ [108 L.Ed.2d 316, 329, 110 S.Ct. 1190].) The instruction clearly stated that the death penalty could be imposed only if the jury found that the aggravating circumstances outweighed mitigating. There was no need to additionally advise the jury of the converse (i.e., that if mitigating circumstances outweighed aggravating, then life without parole was the appropriate penalty).

Defendant also contends that the instruction given here created a presumption in favor of death because once any aggravating factor has been found, a death sentence is mandated unless the defendant meets the burden of overriding the aggravation with sufficient mitigation. He relies on *Adamson* v. *Ricketts* (9th Cir. 1988) 865 F.2d 1011 and *Jackson* v. *Dugger* (11th Cir. 1988) 837 F.2d 1469. We rejected a similar contention in *People* v. *Andrews* (1989) 49 Cal.3d 200, 230 [260 Cal.Rptr. 583, 776 P.2d 285]: "The instruction in *Jackson* and the statute in *Adamson* suffer from a similar

defect: in each the sentencing entity is told that a sentence of death is the norm, and that a lesser penalty may be imposed only if the defense presents sufficient mitigating evidence. In both instances, the accused bore the burden of demonstrating that death was not an appropriate penalty." In contrast, our statute and instruction give the jury broad discretion to decide the appropriate penalty by weighing all the relevant evidence. The jury may decide, even in the absence of mitigating evidence, that the aggravating evidence is not comparatively substantial enough to warrant death. "Unlike the language involved in *Jackson* and *Adamson*, the language at issue here does not create a presumption in favor of death." (*Ibid.*; see also *People* v. *Robertson* (1989) 48 Cal.3d 18, 63-64, fn. 16 [255 Cal.Rptr. 631, 767 P.2d 1109].) Moreover, the continuing validity of *Jackson* and *Adams* seems doubtful after the decision in *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078], finding that the Pennsylvania death penalty statute satisfied the requirements of the Eighth Amendment even though it mandated a death sentence upon the jury's finding one aggravating circumstance and no mitigating circumstances.

### 2. *Issues Regarding Sentencing Procedures*

Defendant asks us to reconsider the following holdings: (A) The court need not instruct sua sponte that life imprisonment without parole means a defendant would never be considered for parole. (*People* v. *Bonin* (1988) 46 Cal.3d 659, 698 [250 Cal.Rptr. 687, 758 P.2d 1217].) (B) The court properly responded to a jury inquiry about the possibility of a change in the law allowing parole by admonishing the jury not to speculate about any possibility of a change in the law, and that the case must be decided on the basis of the law as it is now. (*People* v. *Caro* (1988) 46 Cal.3d 1035, 1064-1065 [251 Cal.Rptr. 757, 761 P.2d 680].) (C) The court need not delete assertedly inapplicable aggravating and mitigating sentencing factors from the jury instructions. (*People* v. *Boyde* (1988) 46 Cal.3d 212, 251 [250 Cal.Rptr. 83, 758 P.2d 25].) (D) It was not necessary to clarify the section 190.3, factor (b) instruction to state that it refers to violent criminal activity other than the crimes charged in this proceeding. (*People* v. *Bonin, supra*, 46 Cal.3d at pp. 703-704.) (E) The section 190.3, factor (d) reference to "extreme" mental or emotional disturbance is not unconstitutionally limiting in view of the existence of the "catchall" provision of section 190.3, factor (k), regarding mitigating circumstances. (*People* v. *Caro, supra*, 46 Cal.3d at p. 1064.) (F) The 1978 death penalty statute is not unconstitutional even though it does not require findings that (i) death is the appropriate penalty beyond a reasonable doubt, (ii) aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt, (iii) aggravating circumstances were true beyond a reasonable doubt, and (iv) written findings and jury unanimity on aggravating factors. (*People* v. *Rodriguez* (1986) 42

Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) (G) The trial court need not instruct the jury to affirmatively consider mercy and sympathy toward a defendant. (*People* v. *Caro, supra,* 46 Cal.3d at p. 1067.) (H) It is not unconstitutional to use the same felony for felony-murder and special circumstance eligibility. (*People* v. *Adcox* (1988) 47 Cal.3d 207, 272 [253 Cal.Rptr. 55, 763 P.2d 906].)

We see no reason to reconsider these holdings and decline to do so.

### 3. *Prosecutorial Misconduct*

■ Defendant contends that the prosecutor committed prejudicial misconduct by arguing general deterrence during the penalty argument and persisting in that argument despite the court's order to cease arguing deterrence. The subject arose during the prosecutor's discussion of the purpose of punishment. In his argument, he asserted that studies have shown the death penalty serves as a deterrent. At that point the court, sua sponte, ordered counsel to the bench and instructed the prosecutor that *general* deterrence was not a proper subject for argument. The court stated, "You may argue the effects of punishment as to this defendant, but not as to others." The court then admonished the jury as follows: "Ladies and gentlemen, with regard to argument of counsel with regards to considerations for and against the imposition of the death penalty, one of the factors that was alluded to was the deterrence of the death penalty to others. That is not an appropriate consideration for this jury with regards to the punishment to be imposed in this case. [¶] The factors that this court—this jury must consider with regards to the imposition of sentence is factors relevant to this defendant and to this crime. [¶] And you are not to consider the effect of deterrence or lack of deterrence on others as a factor in deciding the penalty in this case. [¶] Do all the jurors understand this admonition?" The jury answered collectively in the affirmative.

The prosecutor then immediately continued: "But there are people in society who do believe in deterrence. Particularly organized crime and drug dealers. And therefore, I don't wish to associate myself either with organized crime or with drug dealers, but simply to point out that this is not a flight of fancy; and certainly it deters the person who commits the crime."

While defense counsel failed to object when the deterrence argument was first made and thus arguably waived the point, the court on its own raised the issue. (*People* v. *Green, supra,* 27 Cal.3d at pp. 27-34.) In such a case defendant argues that the *Green* rule is inapplicable. However, in the circumstances of this case we need not resolve that issue because we fail to see how defendant could have been prejudiced in light of the court's direct,

clear and immediate admonition to ignore such argument and the jurors' collective reply that they understood the admonition.

Defendant contends that additional misconduct was committed when the prosecutor continued his argument after the court's admonition. The statements immediately following the admonition skated dangerously close to what the prosecutor had just been told not to discuss and arguably may have been in contravention of the court's ruling. Defendant did not object; but even if the lack of objection may be excused, we believe that the curative effect of the admonition that immediately preceded the statements had a carry-over effect to encompass the latter statements as well.

Defendant further contends that if defense counsel's failure to object waived the point, such failure constituted ineffective assistance of counsel. However, even if counsel can be faulted for failing to object, the court's admonition and the jurors' acknowledgement thereof obviated any prejudice and accomplished what *Green* requires. (*People* v. *Green, supra,* 27 Cal.3d at pp. 27-34.)

### 4. *Booth Error*

*After* denying the motion for modification of the death verdict, the court allowed a friend of the victim's family to testify about the impact of the crime on the family. Defendant contends the testimony was improper because section 1191.1 restricts such testimony to the "next of kin" and because it was violative of the principles set forth in *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. Even if defendant is correct in asserting the testimony was unauthorized, there was no prejudice since the court had already denied the motion to modify the verdict. There was also no *Booth* error for that reason. (See *People* v. *Babbitt* (1988) 45 Cal.3d 660, 725 [248 Cal.Rptr. 69, 755 P.2d 253].) Even if the testimony had preceded the modification ruling, defendant's claim of *Booth* error would still be unavailing because we concluded in *People* v. *Benson* (1990) 52 Cal.3d 754, 812 [276 Cal.Rptr. 827, 802 P.2d 330], that "the broad holding of *Booth* and *Gathers* [*South Carolina* v. *Gathers* (1989) 490 U.S. 805 (104 L.Ed.2d 876, 109 S.Ct. 2207)] does not extend to proceedings relating to the application for modification of a verdict of death under section 190.4(e)."

### CONCLUSION

The judgment is affirmed in its entirety.

Lucas, C. J., Kennard, J., Arabian, J., and Baxter, J., concurred. Broussard, J., concurred in the judgment.

**MOSK, J.**—I concur in the judgment. After review, I have found no error warranting reversal.

I write separately to explain my views as to a number of defendant's contentions.

I

Defendant claims that trial counsel provided him with ineffective assistance in violation of his rights under both the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15, of the California Constitution.

The majority reject the point. I do too. I agree that counsel's performance did not prejudice defendant. But I simply cannot agree that it was not deficient. Doubts about counsel's conduct of the defense are raised by the unconscionably meager time he devoted to preparation. Those doubts are confirmed by his manifest, and fundamental, misunderstanding of two crucial matters: the law of felony murder—a doctrine familiar to every law student—and the scope of the felony-murder special circumstance. It appears that the trial court eventually corrected counsel's mistakes. But it did so only *after* he had tried the guilt phase laboring under those misapprehensions.

I shall not dispute at this time the current teaching that a court should evaluate counsel's performance deferentially. But I must state what all should know: when, as here, a judgment is at risk, it is all too tempting for a court to conclude that counsel's conduct was reasonable. It is salutary to recall that " '[D]eference is not abdication' [citation]; it must never be used to insulate counsel's performance from meaningful scrutiny and thereby automatically validate challenged acts or omissions." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 217 [233 Cal.Rptr. 404, 729 P.2d 839].)

II

Defendant claims that the trial court erred by failing to instruct on certain offenses. The court gave instructions on first degree felony murder and robbery. It should also have given instructions, according to defendant, on first degree willful, deliberate, and premeditated murder, second degree murder, and grand theft.

The majority reject the point. I join in their result, but not in their reasoning.

"It is, of course, virtually axiomatic that a trial court must correctly instruct on such legal principles as are applicable to the evidence [citation]—and on such legal principles alone. The failure or refusal to do so constitutes error." (*People* v. *Benson* (1990) 52 Cal.3d 754, 799 [276 Cal.Rptr. 827, 802 P.2d 330].)

I find no error in the trial court's failure to instruct on first degree willful, deliberate, and premeditated murder, second degree murder, and grand theft. My reason is simple: none of these offenses is supported by the evidence.

The majority attempt to invoke the doctrine of invited error as to first degree willful, deliberate, and premeditated murder and second degree murder. They appear to assume that the trial court was under an obligation to instruct on those offenses sua sponte. Even if that assumption were valid, the doctrine would *not* be applicable unless counsel expressed a sound tactical basis for the decision that allegedly "invited" the claimed error. (E.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 931-932 [269 Cal.Rptr. 269, 790 P.2d 676].)[1] Here, it is true, counsel stated a reason for his request that the trial court instruct only on first degree felony murder. But in view of his manifest and fundamental misunderstanding of that doctrine, I cannot deem his reason "sound."

### III

Defendant claims that the trial court erred by instructing as it did on homicide. The majority are not persuaded. I am.

. As stated above, a trial court must correctly instruct on applicable principles and on applicable principles alone; otherwise, it commits error. Here, the instructions on homicide embraced both murder (including first degree willful, deliberate, and premeditated murder and felony murder) and manslaughter. Only felony murder, however, was supported by the evidence. Hence, the court erred by going beyond that offense.

Be that as it may, I cannot conclude that reversal is required. Certainly, no prejudice appears. On this record, the extra instructions were "surplus-

---

[1] To the extent that the discussion in the majority opinion in *People* v. *Cooper, ante,* page 771 [281 Cal.Rptr. 90, 809 P.2d 865], is to the contrary (*id.* at pp. 827-831), it is unsound for the reasons stated in Justice Broussard's dissenting opinion therein (*id.* at pp. 850-859).

age and could not have adversely affected the verdict." (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1311 [248 Cal.Rptr. 834, 756 P.2d 221].)

## IV

Defendant claims that the trial court committed error under *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], overruled by *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306], by giving instructions he asserts were ambiguous on the requirement of intent to kill for the actual killer under the felony-murder-robbery special circumstance.

The majority reject the point. I do too. But their discussion does little more than state the conclusion.

The trial court instructed the jury in relevant part as follows.

"If you find the defendant guilty of murder of the first degree, you must then determine if the murder was committed under the following special circumstance:

"That the murder was committed by defendant Henry Earl Duncan while he was engaged in the commission of robbery, in violation of section 211 of the Penal Code.

"A special circumstance must be proved beyond a reasonable doubt. If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find that it is not true.

"If defendant Henry Earl Duncan was an aider and abettor, but not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being before you are permitted to find the alleged special circumstance of that first degree murder to be true as to defendant Henry Earl Duncan.

"In order to find the special circumstance charged in this case to be true or untrue, you must agree unanimously.

". . . . . . . . . . . . . . . . . . . . .

"To find that the special circumstance referred to in these instructions as murder in the commission of robbery is true, it must be proved, one, that the murder was committed while the defendant was engaged in the commission of a robbery; [¶] two, that the defendant intended to kill a human being or intended to aid another in the killing of a human being; [¶] three, that the murder was committed in order to carry out or advance the commission of the crime of robbery or to facilitate the escape therefrom, or to avoid detection. [¶] In other words, the special circumstance referred to in these instructions is not established if the robbery was merely incidental to the commission of the murder."

In addressing defendant's claim, the crucial question is: Did the foregoing instructions adequately inform the jury of the requirement of intent to kill for the actual killer?

To resolve that question, a court must determine how a hypothetical "reasonable juror" would have, or at least could have, understood the charge. (See *Cage* v. *Louisiana* (1990) 498 U.S. __, __ [112 L.Ed.2d 339, 342, 111 S.Ct. 328, 329] (per curiam) ["could have"]; *Francis* v. *Franklin* (1985) 471 U.S. 307, 315-316 [85 L.Ed.2d 344, 354, 105 S.Ct. 1965] [same]; and *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218] ["would have"].)

In my view, the instructions in question did indeed adequately inform the jury of the requirement of intent to kill for the actual killer. A reasonable juror would have understood the charge as follows, and could not have construed it otherwise: a defendant can be liable under the felony-murder-robbery special circumstance as either the actual killer or an aider and abettor; his liability depends on the presence of intent to kill *or* intent to aid another in a killing; the liability of an aider and abettor demands the latter; and, therefore, the liability of the actual killer demands the former.

Defendant argues to the contrary. He asserts that a reasonable juror would have, or at least could have, been misled by the following sentence: "If defendant Henry Earl Duncan was an aider and abettor, but not the actual killer, it must be proved beyond a reasonable doubt that he intended to aid in the killing of a human being . . . ." I disagree. A reasonable juror might perhaps have inferred from the quoted language that for the actual killer, there is no requirement of intent *to aid another in a killing*. But such a juror simply could not have inferred that for the actual killer, there is no requirement of intent *to kill*.

## V

Accordingly, having found no prejudicial error in the claims discussed above or in any other, I am of the opinion that the judgment should be affirmed.

Appellant's petition for a rehearing was denied August 14, 1991.